RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

## Supreme Court of Kentucky

2017-SC-000275-DG

DATE 3/14/19 Kim Redman, DC

VERONICA BRADLEY                                                      APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.            CASE NO. 2016-CA-000550-MR
FRANKLIN CIRCUIT COURT NO. 15-CI-00430


KENTUCKY RETIREMENT SYSTEMS                            APPELLEE


**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>AFFIRMING</u>**

Appellant Veronica Bradley, a member of the Kentucky Retirement

Systems (KERS),[1] was denied disability retirement benefits by the KERS Board.

Although the circuit court reversed the Board on judicial review, the Court of

Appeals concluded that the standard for judicial reversal of the Board's

decision in disability retirement cases had not been met and thus reversed and

remanded for reinstatement of the Board's final decision denying Bradley's

claim. On discretionary review, Bradley challenges the standard of judicial

review set forth in the oft-cited *McManus v. Kentucky Retirement Systems*, 124

S.W.3d 454 (Ky. App. 2003), and expressly adopted by this Court in *Kentucky*

*Retirement Systems v. Brown*, 336 S.W.3d 8 (Ky. 2011), as inconsistent with

---

[1] We use the initials KERS rather than KRS to avoid confusion with initials
used to designate the Kentucky Revised Statutes.

the disability retirement provisions of Kentucky Revised Statutes (KRS) Chapter 61 and administrative law provisions of KRS Chapter 13B, and as "inappropriate" for disability retirement cases.

Today, in *Kentucky Retirement Systems v. Ashcraft*, 2017-SC-000345-DG, we reiterate the propriety of the *McManus* standard, while acknowledging that courts should make a threshold determination as to whether the Board's order is supported by substantial evidence as required by KRS 61.665(3)(d) before considering whether the applicant's proof was so compelling that it meets the high bar set by *McManus*. In this case, we restate the consistency of our approach with controlling statutes and conclude that the "inappropriateness" identified by Bradley is essentially a request to redesign the disability retirement process, something we are not at liberty to do. In addition to these general issues, Bradley maintains the Board's decision was not supported by substantial evidence and that the uncontradicted objective medical evidence proves she was disabled due to Lyme disease for twelve continuous months following her last day of paid employment. We disagree with Bradley on both counts and find that she has not met the standard for judicial reversal of the administrative decision by the Board, the fact-finder in the statutory process adopted by our General Assembly.

## RELEVANT FACTS

Bradley worked for the Kentucky Auditor of Public Accounts from June 1, 1999, until December 31, 2010. After obtaining her CPA license in November 2000, she steadily advanced in the agency and eventually attained

2

the supervisory position of Public Accounts Auditor V-IT. Her duties involved supervising junior staff, audit testing, data analysis, drafting reports, and training, all of which required strong intellect, skills, and mental stamina.

In early 2009, Bradley had increasing difficulty in meeting the demands of her job, which marked the beginning of several mysterious health problems and symptoms, including constant pain, confusion, and difficulties in comprehension and communication. Bradley's job performance began to steadily decline, eventually leading to relief from her supervisory duties.

On May 23, 2010, Bradley applied for KERS disability retirement benefits due to the physical and mental effects of Lyme disease, which she claimed had remained dormant from a tick bite in 2004. She also alleged she suffered from fibromyalgia, fatigue, and anxiety. Bradley submitted evidence, which was reviewed by three medical review board physicians and denied by all on August 13, 2010. The physicians found no compelling objective evidence of a cognitive abnormality or any evidence that Bradley had a functional incapacity for her sedentary job.

Bradley again applied for disability benefits by submitting supplemental medical evidence through December 8, 2010. The second claim included notes from an infectious disease specialist and a neuropsychological evaluation, suggesting that Bradley has some problems with cognitive functioning. Two of the three reviewing physicians denied the claim, stating that there was no evidence of a physical disability that would prevent Bradley from performing work duties. The physicians also disagreed that Bradley truly suffered from

3

chronic disseminated Lyme disease. The third physician recommended that Bradley's case be placed on hold until the neuropsychological evaluations could be reviewed by another physician. The claim was ultimately denied on January 20, 2011. On March 7, 2011, Bradley requested an administrative hearing.

An administrative hearing was conducted on July 24, 2012. At this point, Bradley's application for disability benefits alleged diagnoses of chronic disseminated Lyme disease and fibromyalgia. At the administrative hearing, she testified that her claim was also based on fatigue and anxiety. Further, her objective medical evidence also set out a diagnosis of major depressive disorder. In his findings of fact and conclusions of law, the hearing officer determined that Bradley did not prove by a preponderance of the evidence that her anxiety was not a result of a pre-existing condition. Nor did Bradley prove that the fibromyalgia had resulted in permanent incapacity for her employment. However, the hearing officer found Bradley successfully proved by objective medical evidence that her conditions of Lyme disease, fatigue, and major depressive disorder physically and mentally incapacitated her on a permanent basis, and therefore prevented her from performing her job duties. The hearing officer recommended approval of Bradley's application for disability retirement benefits as to the Lyme disease, fatigue, and major depressive disorder on October 23, 2012.

KERS filed exceptions to the hearing officer's recommendation, and on December 17, 2012, the Disability Appeals Committee (DAC) of the Board of

4

Trustees of Kentucky Retirement Systems (Board) remanded the case to the hearing officer for additional findings. Specifically, the DAC ordered that Bradley undergo definitive diagnostic testing for Lyme disease and an evaluation of her cognitive function.

After delays in medical testing, rescheduling, and telephonic status conferences, the hearing officer ultimately held another evidentiary hearing on October 14, 2014. During the hearing, Bradley submitted medical records from Dr. Lentz, a Lyme disease specialist, and a report from Dr. Price, a clinical neuropsychologist. Dr. Lentz supported Bradley's Lyme disease diagnosis, even though the blood test she conducted was negative for Lyme disease. Despite the results, Dr. Lentz reported that Bradley's continuing cognitive impairment was an effect of Lyme disease and doubted that Bradley would ever regain the sharp intellect she enjoyed before the onset of Lyme disease. Dr. Price reported that Bradley maintains normal cognitive functioning and did not find any cognitive or emotional limitations in Bradley's ability to work.

The hearing officer again concluded that Bradley had shown by a preponderance of objective medical evidence that her Lyme disease, major depressive disorder, and fatigue physically and mentally incapacitated her and prevented her from performing job duties. KERS filed exceptions to the hearing officer's recommendation.

In a final order dated March 31, 2015, the DAC of the Board rejected the hearing officer's recommendation on remand and denied Bradley's claim. The Board found that Bradley did not prove by objective medical evidence that she

5

is permanently functionally incapacitated by chronic disseminated Lyme disease, fibromyalgia, generalized anxiety disorder, depression or fatigue. Further, the Board concluded that Bradley did not prove by objective medical evidence that her generalized anxiety disorder did not pre-exist her employment start date or that her generalized anxiety disorder is not directly or indirectly related to a condition which pre-existed her employment start date.

In its findings, the Board discussed the inconsistencies in the medical evidence, namely Bradley's Lyme disease test results. The physicians who examined Bradley's claims for her initial applications questioned the Lyme disease diagnosis. Further, two of Bradley's treating physicians doubted the Lyme disease diagnosis. The Board also noted that when the case was remanded to the hearing officer for more findings, the blood test performed by Dr. Lentz was negative. Despite Dr. Lentz's report that the absence of Lyme disease in blood test results is not determinative of a patient having Lyme disease, the Board questioned Dr. Lentz's Lyme disease diagnosis, which was based primarily on Bradley's history and symptoms. The Board observed that Bradley told Dr. Lentz that she had a positive result on a Lyme disease test performed by Dr. Hoffman but did not provide Dr. Lentz with a copy of the lab work. The Board also stated that despite being asked to provide a copy of the lab work, the record contained no evidence of Dr. Hoffman's testing. Ultimately the Board determined that Dr. Lentz's statements were unreliable because they were remote in time from the onset of Bradley's symptoms and are directly contradicted by the neuropsychological examination performed by Dr. Price,

6

who concluded that Bradley has normal cognitive function and no evidence of neurological decline.

The Board also criticized the hearing officer for placing little weight on Dr. Price's report (because it was so far in time from Bradley's last day of paid employment) yet relying on Dr. Lentz's statements even though she did not begin treating Bradley until sixteen months after her employment ended and over three years after the onset of symptoms. Additionally, the Board did not find Bradley credible because of conflicting and incorrect information she provided to various doctors, and discrepancies in the objective medical evidence of record.

After the Board's denial of her disability claim, Bradley appealed the decision to the Franklin Circuit Court. On March 24, 2016, the trial court entered an Opinion and Order reversing the KERS's denial of benefits. The trial court agreed with Bradley that the Board improperly stepped into the shoes of Bradley's doctors by re-evaluating the medical records and reports without the proper expertise to do so. The trial court stated that the Board's finding that Bradley failed to meet her burden of proving permanent incapacity is not supported by substantial evidence and that the record compels a finding in her favor.

KERS appealed the trial court's decision to the Court of Appeals. On appeal, the Court of Appeals considered whether the trial court properly applied *McManus*, which sets forth the judicial standard of review for decisions of the KERS. *McManus* provides that "[w]here the fact-finder's decision is to

7

deny relief to the party with the burden of proof or persuasion, the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it." *McManus*, 124 S.W.3d at 458. In Bradley's case, the Court of Appeals answered this question in the negative. In a 2-1 decision,[2] the Court of Appeals determined that the trial court erred in applying a "substantial evidence" standard of review. Further, the Court of Appeals found that the medical evidence was conflicting and that the administrative agency is afforded great latitude in its role as fact-finder.

We granted discretionary review to reexamine the appropriate standard for judicial review of denials of applications for state permanent disability retirement benefits in conjunction with the *Ashcraft* case also issued today, and to address the specific issues Bradley raises regarding proof and the twelve-month post-employment period referenced in KRS 61.600(5)(a).

## ANALYSIS

I.   **The *McManus* Standard Is Consistent with the Statutory Standard of Judicial Review When Applied as Described in *Ashcraft***

In *Ashcraft,* we outline the process by which a disability retirement claim made pursuant to KRS 61.600 wends its way through the administrative process and eventually the courts. It is unnecessary to repeat that description here, except as relevant to the specific issues raised by Bradley. As noted, in a

---

[2] The dissenting judge advocated abandoning the *McManus* standard and opined that the circuit court's review was proper.

8

hearing before the hearing officer conducted pursuant to KRS 61.665(3) and in accordance with KRS Chapter 13B, the disability retirement applicant has the burden of proof, with the burden of persuasion being "met by a preponderance of the evidence in the record." KRS 13B.090(7). Citing this burden and the directive in KRS 61.665(3)(d) that the KERS Board's final order "shall be based on substantial evidence appearing in the record as a whole . . . ," Bradley maintains that *McManus* turns the statutory scheme on its head. The relevant passage from *McManus* provides:

> Determination of the burden of proof also impacts the standard of review on appeal of an agency decision. When the decision of the fact-finder is in favor of the party with the burden of proof or persuasion, the issue on appeal is whether the agency's decision is supported by substantial evidence, which is defined as evidence of substance and consequence when taken alone or in light of all the evidence that is sufficient to induce conviction in the minds of reasonable people. *See Bourbon County Bd. of Adjustment v. Currans*, Ky. App., 873 S.W.2d 836, 838 (1994); *Transportation Cabinet v. Poe*, Ky., 69 S.W.3d 60, 62 (2001) (workers' compensation case); *Special Fund v. Francis*, Ky., 708 S.W.2d 641, 643 (1986). Where the fact-finder's decision is to deny relief to the party with the burden of proof or persuasion, the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it. *See Currans, supra; Carnes v. Tremco Mfg. Co.*, Ky., 30 S.W.3d 172, 176 (2000) (workers' compensation case); *Morgan v. Nat'l Resources & Environ. Protection Cabinet*, Ky. App., 6 S.W.3d 833, 837 (1999). "In its role as a finder of fact, an administrative agency is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses, including its findings and conclusions of fact." *Aubrey v. Office of Attorney General*, Ky. App., 994 S.W.2d 516, 519 (1998) (citing *Kentucky State Racing Commission v. Fuller*, Ky., 481 S.W.2d 298, 309 (1972)).

124 S.W.3d at 458.

Bradley insists that given the plain language of the disability retirement statute, KRS 61.665(3)(d), regardless of who prevails before the Board, a reviewing court should first determine whether the decision is supported by substantial evidence of record, and on that point we agree. As explained more fully in *Ashcraft,* even where the applicant loses before the Board, it is appropriate on judicial review for the courts, at every level, to first consider whether the denial is supported by substantial evidence. If it is not so supported, the court is required to reverse pursuant to KRS 13B.150(2)(c) and KRS 61.665(3)(d). However, if there is substantial evidence supporting the Board's decision, the court should then consider, as explained in *McManus,* whether the applicant's evidence was so compelling that no reasonable person could fail to be persuaded.

One may rightfully query whether once a court finds substantial evidence supporting the Board's decision, there could ever be a circumstance where the denied applicant still prevails because his or her proof is so compelling that no reasonable person could have failed to be persuaded. However, as we explained in *Ashcraft,* some cases may contain substantial evidence of record supporting either of the two sides. Indeed, in the view of the majority of the Court of the Appeals' panel in this very case, "the record contains medical evidence sufficient to support both the conclusion that Bradley suffers from Lyme disease and the conclusion that she does not." In cases such as this where the evidence may, at least at first blush, be perceived to be in equipoise, the *McManus* "compelling evidence" standard properly breaks the tie. It does

10

so by implementing the legislative command that the courts "not substitute [their] judgment for that of the agency as to the weight of the evidence on questions of fact," KRS 13B.150(2), while outlining an understandable test for determining if the fact-finder was "arbitrary, capricious or . . . abuse[d] [its] discretion" in violation of KRS 13B.150(2)(d) when assessing the evidence.

Next, Bradley raises the "preponderance of the evidence" standard applicable in KERS disability retirement hearings and insists that the *McManus* standard ignores or contradicts it by requiring an applicant denied benefits to have "compelling evidence" in support of her case. This argument overlooks a salient fact. Preponderance of the evidence is the applicant's burden of proof before the hearing officer and Board, while the "compelling evidence" standard in *McManus* is a *judicial* standard of review applied by the court after the administrative process has concluded. As noted repeatedly, it is a high standard because of the deference owed the administrative fact-finder. If courts re-applied the preponderance of the evidence standard, they would be assessing the evidence and weighing it *de novo*, in direct violation of KRS 13B.150(2)'s directive that courts "shall not" substitute their judgment for the fact-finder on issues of fact.

Finally, Bradley maintains that the *McManus* standard allows a court to "subjectively guess" whether "there might be at least one reasonable person somewhere out there who would not find the claimant's medical evidence compelling and would, therefore, not be persuaded by it." This restatement of the *McManus* standard does not comport with the standard, as we understand

11

and apply it.[3] As written, *McManus* literally invokes the "reasonable person" standard, *i.e.*, was the applicant's evidence so compelling that reasonable people could not fail to be persuaded by it. While Bradley emphasizes the "no reasonable person" phraseology and insists the language allows the courts to deny her relief if it believes somewhere out there, in "Find Waldo" fashion, there is one reasonable person who would fail to be persuaded by her evidence, that is simply not how we construe it. As Bradley phrases the standard, a justifiably high bar would be much higher and virtually impossible to meet. In our view, the *McManus* standard is applied in a fashion that considers how reasonable people would perceive the disability applicant's proof, would they find it so compelling that they could not fail to be persuaded by it.[4] The emphasis is on the reasonable person's view not whether a random individual in the universe who might be deemed reasonable by those who know him could fail to be persuaded. In any event, to the extent any court or litigant has been laboring under that same misunderstanding as to *McManus*, we disavow it.

---

[3] Bradley alleges that under the *McManus* standard "no matter how many reasonable persons might find a claimant's evidence compelling — if only one reasonable person found the claimant's evidence not compelling, the claimant's claim would be denied." This, too, is not an accurate restatement of the *McManus* standard.

[4] In this very case, the Court of Appeals repeated the "no reasonable person" language from *McManus* at least four times but it also noted "the evidence in Bradley's favor was not so compelling that all reasonable persons must find it persuasive" and, at another point, that her evidence was "not so overwhelming as to persuade all reasonable persons." While Bradley would undoubtedly argue that the "all" proves her point, we do not believe it is intended to be, or is in fact, applied in the "is there one reasonable person out there somewhere" fashion.

## II. Bradley's Argument that Our Review Standard Is "Inappropriate" Stems from an Unpersuasive Comparison to the Workers' Compensation Scheme and Criticism of the Statutory Framework the Legislature Has Provided

Bradley argues that the *McManus* standard should not apply because it has been imported from workers' compensation cases, an arena where the administrative framework is demonstrably different from disability retirement cases. She notes that workers' compensation law "creates a more or less level playing field between injured workers and employers and their insurers — one in which the parties and their lawyers are adversarial and are expected to support their positions with medical evidence which is then considered and ruled on by independent, impartial, and well-schooled fulltime administrative law judges and a three-member Board — none of whom have any connection to either party." Bradley contrasts that to KERS disability retirement where, in her view, "the table is completely stacked" because the medical panel members are chosen and paid for by KERS; the hearing officer is a private attorney with no medical training who is also paid by KERS; KERS counsel appear in opposition to the applicant at the hearing before the hearing officer "no matter how meritorious the claim may be"; and the Disability Review Committee of the Board is comprised of individuals who are untrained in medicine and paid by KERS for their service. Interestingly, Bradley acknowledges that "this arrangement is provided by statute," explicitly recognizing that the General Assembly, not this Court, has devised it. While the authority to dictate the "arrangement" for processing disability retirement claims clearly belongs to the

13

legislature, not this Court, and our discussion could end with that, one point requires clarification.[5]

KERS counsel appear at a hearing only if the medical review panel has recommended denial of the application and the applicant has requested a hearing to pursue benefits. If the medical review panel recommends a grant of the application, the matter ends there with KERS obligated to pay the applicant without further ado. KRS 61.665(2)(e). If a hearing is being held, the applicant has already had his/her claim denied by at least two physicians. In this case, Bradley's case was reviewed and denied twice; the first recommendation of denial was unanimous, and the final medical review decision consisted of two physicians recommending denial and one requesting a further record review. Thus, at the point of a hearing there are already credible grounds for questioning whether the applicant's claim is meritorious.

Turning to Bradley's argument that the *McManus* standard was born in the workers' compensation cases and does not translate to disability retirement, she has no basis for that assertion other than her aforementioned dissatisfaction with the "arrangement provided by statute." As we have elaborated upon in *Ashcraft* and this case, in those cases where the non-prevailing party challenges the Board's assessment of the evidence, *McManus*

---

[5] We cannot address Bradley's claims regarding the relative education and experience of the hearing officers for KERS matters vis-à-vis workers' compensation matters or the medical training of the DAC members vis-à-vis the Workers' Compensation Board because there is no evidence of record on these issues. In any event, as she acknowledges, the administrative process is designed by the legislature, and any perceived flaws should be addressed to that branch of government absent cognizable constitutional claims.

14

does indeed reflect the proper role of the judiciary in reviewing the decision of the Board, the fact-finding agency whose decision is entitled to deference by statute.[6] KRS 13B.150(2).

### III. The Board's Final Order Is Supported by Substantial Evidence and Bradley's Proof Does Not Meet the *McManus* "Compelling Evidence" Standard

The Board's 24-page final order includes over 21 pages of findings of fact that examine the evidence in great detail. While recounting all of its findings is unnecessary, the primary points merit mention.

The Board found that Bradley initially alleged she was permanently disabled by chronic disseminated Lyme disease and fibromyalgia, although at the hearing stage she withdrew the fibromyalgia as a "false" diagnosis and added fatigue and anxiety. The employer made accommodations including providing special equipment, providing assistance with lifting and moving and relieving her of supervisory duties. Ultimately, the Board found that she had not proven by objective medical evidence that she was permanently incapacitated by any of these diagnoses and, further, she had not proven the generalized anxiety disorder did not pre-exist her membership in KERS or that an accident or injury in the course of her employment aggravated a pre-existing condition. The Board rejected any permanent disability due to cognitive

---

[6] As KERS notes, the *McManus* standard is employed for judicial review of administrative decisions in areas beyond workers' compensation and KERS disability retirement cases. *See, e.g., Bowlin Group LLC v. Secretary of Labor*, 437 S.W.3d 738 (Ky. App. 2014) (applying *McManus* as to Kentucky Occupational Safety and Health Review Commission decision); *Morgan v. Nat. Res. & Environ. Protection Cab.*, 6 S.W.3d 833 (Ky. App. 1999) (pre-*McManus* but applying the compelling evidence test); *Bourbon Cty. Bd. of Adjustment v. Currans*, 873 S.W.2d 836 (Ky. App. 1994) (same).

15

deficiencies, fatigue or depression and concluded to the extent those existed they are directly or indirectly related to her pre-existing anxiety disorder. The Board specifically rejected the proposition that Lyme disease and fibromyalgia cumulatively rendered Bradley permanently functionally incapacitated.

Much of the Board's focus was, as was Bradley's, on Lyme disease. On this point the Board stated:

> The objective medical evidence of record clearly indicates that Claimant has never had a positive Lyme Disease AB, a positive Lyme IgM, or a positive Western Blot test clearly establishing that she has Lyme disease. If one existed, Claimant would have submitted it to the administrative record. The testing for Lyme disease in the record is all equivocal or negative. The Board's finding is based on the results of testing for Lyme disease of record and the objective medical evidence from examining physicians and medical examiners, some of whom reference blood tests results that they saw that were negative for Lyme disease but that have not been submitted to the administrative record, expressing doubt that Claimant actually has Lyme disease.

The Board noted that Bradley's general practitioner, Dr. Barnes, referred to a positive Western Blot test but the file contained no test results, while two Lexington physicians referred to negative Western Blot tests. Specialists Drs. Meeks and Brown found the Lyme disease diagnosis "questionable" while the second Wisconsin physician Bradley sought out, Dr. Lentz, proceeded to treat her for Lyme disease based on her self-report and alleged lab work performed by a previous Wisconsin-based Lyme disease specialist, Dr. Hoffman. (Those alleged lab results are not in the record either.). The Board notes no evidence was produced that Dr. Lentz ever did testing for Lyme disease until the Board remanded the case to the hearing officer for definitive testing and that test was

16

negative for Lyme disease.[7] While Dr. Lentz defended her diagnosis with contentions that the test could be negative and Bradley could still have the disease as reflected "most alarmingly, [by Bradley's] cognitive deterioration," the Board found Dr. Lentz never did any cognitive testing or ordered any to be done. Dr. Price, a clinical neuropsychologist, performed extensive testing and concluded there was no cognitive deterioration. This led the Board to state: "Dr. Lentz's statements about [Bradley's] cognitive decline are solely based on [her] self-report of cognitive decline and so are unreliable."

The Board noted that the hearing officer had placed little weight on Dr. Price's cognitive evaluation because it was removed in time from Bradley's last day of employment yet gave credence to Dr. Lentz who relied on self-reporting and did not treat Bradley until over sixteen months after she last worked for the Commonwealth. The Board found, not surprisingly, that Dr. Price's objective testing was entitled to more weight than Dr. Lentz's opinion based on Bradley's self-reporting.

The Board rejected Bradley's claims of permanent physical functional incapacity, noting objective medical evidence that she had no physical impairment and the two physicians who alleged she did (Hoffman and Gregg) proceeded from the premise she had Lyme disease. The Board noted evidence

---

[7] The Lyme IgM lab results from Frankfort Regional Medical Center are in the record and show a result of 1.09, which is expressly deemed "equivocal" by the lab; the results must be over 1.09 for the test to be deemed positive. Even with a positive Lyme IgM, the lab stated that a positive Lyme disease diagnosis should be confirmed by clinical findings and a positive Western Blot test.

of record from a neurologist that her physical complaints were "probably psychogenic. She has a phenomenal number of complaints and a normal exam." As for the anxiety disorder, the Board reviewed in detail a psychiatric evaluation and evidence showing that Bradley had a "history of mental health problems, anxiety, OCD [Obsessive Compulsive Disorder] and referenc[ing] a diagnosis of posttraumatic stress disorder." Some of the issues dated to her teenage years and an early trauma. An examination by Dr. Allen involving neuropsychological testing was addressed, and to the extent he found some minor issues, the Board discounted his opinion because Bradley had not told him about her diagnosed anxiety, teenage suicide attempt or hospitalization for mental health issues in her teen years, all predating her employment.

The Board addressed Bradley's credibility directly:

> The Board disagrees with the Hearing Officer's finding that Claimant is credible. During her testimony, Claimant appeared sincere and distressed by her health status. However, Claimant's credibility is negatively affected by conflicting and incorrect information she provided to various doctors reflected in the objective medical evidence of record.

> Claimant told Dr. Lentz that there had been a positive Lyme IgM test, which was a significant factor in Dr. Lentz agreeing with the previous diagnosis of Lyme disease. Claimant also told Dr. Lentz that the infectious disease doctor she had been seeing did not treat Lyme disease and so she had went (sic) to Dr. Hoffman. The records reflect that Claimant had already arranged to be seen at the Lyme Disease Center (Dr. Hoffman) prior to her first appointment with Dr. Meeks. (A. R., p. 195). Furthermore, there is no indication in the record that Dr. Meeks did not treat Lyme disease. The fact is Dr. Meeks did not believe Claimant had Lyme disease. Claimant even testified during the hearing that she had had a positive Western Blot test despite the absence of one in the administrative record.

18

To underscore their skepticism, the Board quoted at length from an August 2004 office note by Dr. Howley wherein he noted Bradley had documented her complaints from August 4 through August 31, 2004, in an elaborate multi-page document with charts describing "49 different symptoms." The Board noted her conflicting reports of tick bites (in January 2010 she reported never having been bitten, but two months later she reported she had been bitten in 2004), and her testimony that her son, who had been reported as healthy since his 2005 birth, was being treated for Lyme disease in 2010, due to her allegations he had contracted it from breast milk.

Ultimately, the Board denied Bradley's application for failure to prove by a preponderance of the evidence that she was entitled to disability retirement. Having considered the record, including the two reports from the hearing officer, we can say with confidence that the Board's decision in this case is supported by substantial evidence. KRS 61.665(3)(d). The circuit court found otherwise, agreeing with Bradley that "the Board improperly stepped into the shoes of [her] doctors, reevaluating the medical records and reports without the proper expertise to do so." To the contrary, the Board examined the "whole record" (as required by KRS 61.665(3)(d)) closely, and consistent with *Kentucky Retirement Systems v. Bowens*, 281 S.W.3d 776 (Ky. 2009), declined to give greater weight to Bradley's primary treating physicians on the Lyme disease diagnosis, Drs. Hoffman and Lentz, because neither had objective lab testing substantiating the diagnosis and relied heavily, if not exclusively, on Bradley's self-reporting of symptoms. The Board detailed the objective medical evidence

of record supportive of its conclusion that Bradley is not permanently disabled under the KERS statutes. The Board is the fact-finder in these matters and it did its job in this case consistent with the statutory standard.

Next, because Bradley did not meet her burden of proof before the Board, we consider the *McManus* standard and whether her proof was so compelling that no reasonable person could have failed to be persuaded by it. Her proof does not meet this high standard. Although Bradley argues the Board disregarded "uncontradicted objective medical evidence," the record loudly refutes the "uncontradicted" characterization, and the Board's final order reflects substantial objective medical evidence contrary to Bradley's claim. Even if the record could be viewed as the Court of Appeals saw it — as containing substantial evidence both in support of the Lyme disease diagnosis and in contradiction — undeniably Bradley's proof was not compelling. Indeed, in our view, the Board was correct in concluding that the absence of any objective medical test results regarding Lyme disease weighs heavily against the opinion of those physicians who treated Bradley based on her self-reported symptoms, symptoms that objective testing by specialists failed to substantiate. The Board's final decision is plainly supported by substantial evidence and Bradley has failed to meet the *McManus* standard for reversal of the fact-finder's decision. Accordingly, the Court of Appeals was correct in its reversal of the circuit court and remand to that court for reinstatement of the Board's final decision.

20

## IV. Bradley Misconstrues the Import of KRS 61.600(5)(a) Regarding an Incapacity That "Can be Expected to Last for a Continuous Period of Not Less than Twelve Months from the Person's Last Day of Paid Employment"

Bradley states that because she had less than sixteen years of service in the Kentucky Retirement System she had the "burden of proving by a preponderance of the objective medical evidence of record that during the twelve months following her last day of paid employment she was continuously incapacitated from performing her job . . . on a regular and continuous basis and that the disability was not the result of a condition which preexisted her employment with the Commonwealth. . . ." She emphasizes the twelve-month period (which she deems the "disability period") and insists that if the Board had looked at that period, her medical evidence, and only her evidence, merited consideration. She argues "functional abilities or occupational capacity at any time after the disability period are immaterial and irrelevant to the determination of her permanent incapacity under the statute." As the KERS Board notes, Bradley cites no authority for this proposition, which she apparently derives from the statutes.

KRS 61.600(3) generally describes the concept of incapacity for disability retirement purposes, in relevant part, as follows:

> Upon the examination of the objective medical evidence by licensed physicians pursuant to KRS 61.665, it shall be determined that:
>
> (a) The person, since his last day of paid employment, has been mentally or physically incapacitated to perform the job, or jobs of like duties, from which he received his last paid employment. In determining whether the person may return to a job of like duties, any reasonable accommodation by the employer

21

as provided in 42 U.S.C. sec. 12111(9) and 29 C.F.R. Part 1630 shall be considered;

(b) The incapacity is a result of bodily injury, mental illness, or disease. For purposes of this section, "injury" means any physical harm or damage to the human organism other than disease or mental illness;

(c) The incapacity is deemed to be permanent; and

(d) The incapacity does not result directly or indirectly from bodily injury, mental illness, disease, or condition which pre-existed membership in the system or reemployment, whichever is most recent.

Bradley's twelve-month disability period argument is derived from KRS 61.600(5)(a) which provides:

1. An incapacity shall be deemed to be permanent if it is expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months from the person's last day of paid employment in a regular full-time position.

2. The determination of a permanent incapacity shall be based on the medical evidence contained in the member's file and the member's residual functional capacity and physical exertion requirements.

Bradley insists that she had uncontradicted medical evidence relevant to the twelve-month period from six physicians,[8] and the Board should have looked no further. We disagree.

---

[8] The Board found no testing to support the Lyme disease findings of the Wisconsin physicians, Drs. Hoffman and Lentz; identified Dr. Gregg as a Social Security consultative physician who never saw Bradley and examined records that assumed a Lyme disease diagnosis; and found Dr. Elliott, a psychiatrist, diagnosed "generalized anxiety disorder and cognitive impairment due to Lyme disease," finding no pre-existing issues after being informed by Bradley's counsel of the prohibition on pre-existing conditions in KRS 61.600. Dr. Lee, although not mentioned by the Board, was another Social Security consultative physician who had the same records Dr. Gregg reviewed. The sixth physician referred to by Bradley appears to be Dr. Barnes, Bradley's general practitioner, who referred to a positive Western Blot test but, again, provided no record of the test in the blood work results. If Dr. Leung is included,

22

KRS 61.600(5)(a) defines permanent incapacity in a way that refers to two potential outcomes from the applicant's diagnosis/condition: death or incapacity expected to last for a twelve-month continuous period from the last day of employment. The language in no way creates a barrier as to the timing of the medical evidence, making evidence from the eleventh month of the period relevant but evidence from the thirteenth month following the last day of work or any subsequent time totally irrelevant. If that were the case, as KERS correctly notes, much of Bradley's own evidence would not be considered, including the primary report from Dr. Lentz, who did not see Bradley until sixteen months after her last day of work.

In sum, KRS 61.665(3)(d) requires the Board to consider the record as a whole, and thus all credible evidence of record relevant to the issue of permanent disability is properly considered by the Board. Any artificial limitation to evidence from the twelve-month period immediately following the last day of the applicant's employment is not supported by the statute and therefore unjustified.

## CONCLUSION

While Bradley finds much to dislike about the disability retirement process, it is the system devised by our General Assembly and her application has been addressed and reviewed in a manner consistent with the statute. On

---

although the Board made no findings with respect to him, the hearing officer only alluded to MRI reports in his records (Bradley's brain, neck and low back), all of which were "unremarkable." To the extent his records may have referred to Lyme disease, again there is no evidence of any independent lab testing confirming that diagnosis.

23

judicial review, she has failed to show that the Board's final order was not supported by substantial evidence and has further failed to address how her proof meets the compelling evidence standard set forth in *McManus*, choosing instead to challenge the propriety of the standard itself. As we hold today in this case and in *Ashcraft*, the *McManus* standard remains viable and controlling on judicial review of cases such as this where the Board — the fact-finder — concludes that the applicant has failed to meet her burden of proof. Bradley's proof does not meet the *McManus* standard.

For the foregoing reasons, we affirm the Court of Appeals' decision reversing the trial court and remanding this matter to that court for reinstatement of the Board's final decision.

All sitting. All concur.

COUNSEL FOR APPELLANT:

John Hardin Gray
Roy Church Gray III

COUNSEL FOR APPELLEE:

Katherine I. Rupinen